IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 29, 2020 at Knoxville

## STATE OF TENNESSEE v. DEMARCUS STEVENSON

**Appeal from the Criminal Court for Shelby County**
No. 16-05852        James M. Lammey, Judge

_____

### No. W2019-01785-CCA-R3-CD

_____

A Shelby County jury convicted Defendant, Demarcus Stevenson, of second degree murder, attempted second degree murder, and employing a firearm during the commission of a dangerous felony, for which Defendant received an effective sentence of forty-three years' incarceration. On appeal, Defendant contends that the trial court erred by admitting into evidence the prior written statement of a witness, in its entirety, as a prior inconsistent statement under Tennessee Rule of Evidence 803(26) and by admitting testimony under Tennessee Rule of Evidence 404(b) regarding Defendant's prior act of violence against the murder victim. Defendant also challenges the sufficiency of the evidence. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Mark Mesler (on appeal) and Jason Matthews (at trial), Memphis, Tennessee, for the appellant, Demarcus Stevenson.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Ryan Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Background

This case concerns the shooting death of Frederick Johnson on September 5, 2015, following an argument between Mr. Johnson and Defendant at the Save-A-Stop Number Two market in Memphis. At trial, Officer Jonathan Douglas of the Memphis Police Department (MPD) testified that he responded to the scene of a "shots fired" call near a residence on Kimball Avenue. Officer Douglas saw an unattended motor scooter lying in the road along with twelve 9mm shell casings nearby. Officer Douglas searched the area and found an unresponsive Mr. Johnson, lying face down in a nearby backyard. When paramedics arrived, they found that Mr. Johnson was deceased.

Officer Lee Walker testified that he worked for the Crime Scene Division of the MPD. Officer Walker responded to the crime scene, where he photographed potential evidence and created a crime scene sketch. Officer Walker collected the twelve 9mm shell casings near the scooter on Kimball Avenue. At a second location further down Kimball Avenue, he recovered nine .40 caliber shell casings, sixteen .223 caliber casings, five .357 caliber casings, and one casing of an unknown caliber.

Dr. Paul Benson testified that he was a medical examiner and forensic pathologist at the West Tennessee Regional Forensic Center in Memphis. Dr. Benson performed an autopsy on Mr. Johnson. He concluded that the cause of Mr. Johnson's death was "gunshot wounds to the chest" and that manner of death was homicide. Dr. Benson's examination showed that Mr. Johnson suffered two gunshot wounds. The first gunshot wound went through the right forearm and then into the chest, causing damage to the right lung. Dr. Benson recovered the bullet lodged in Mr. Johnson's back. The second gunshot wound was to the chest; the bullet entered on the right side of the back, hit the right lung, and then went to the front of the chest. Dr. Benson stated that Mr. Johnson's death would have occurred within minutes of being shot. During his examination of the body, Dr. Benson also noted that Mr. Johnson had a scar on the left thigh from an old gunshot wound. An x-ray showed an old bullet present in the left thigh, which showed signs of corrosion and breakdown of the metal.

MPD Officer Chester Striplin testified that he assisted in the investigation by attempting to retrieve video surveillance footage from three locations near the crime scene. He first went to Save-A-Stop but found that the market's video surveillance "rewrites itself" every four hours and that, by the time he arrived at the market at 6:30 or 7:00 a.m., the video of the night before had been rewritten. Officer Striplin then spoke to a homeowner near the crime scene who had surveillance cameras outside his home. The homeowner gave Officer Striplin permission to review footage from the cameras. Officer

Striplin found video footage of a person on a scooter and a second person in another vehicle involved in an altercation. He transferred the video footage to a DVD and provided it to the lead investigator, Lieutenant James Sewell. Officer Striplin also gave Lieutenant Sewell relevant video surveillance footage, which he obtained from the third location—Captain J.J.'s Fish and Chicken Restaurant.

MPD Officer Adam Pickering testified that, on September 15, 2015, he assisted Lieutenant Sewell in executing a search warrant at an apartment on Orange Leaf Circle, where Defendant lived with his mother. Officer Pickering recovered a loaded .357 Sig Sauer magazine on the couch in the living room and a loaded .357 Sig Sauer pistol in the bottom of a closet underneath some clothes. Under a bed in Defendant's mother's bedroom, officers found a .38 caliber Charter Arms revolver that contained five live rounds of .38 special ammunition.

MPD Lieutenant James Sewell testified that, on September 5, 2015, he was working in the department's Homicide Division and was assigned as the lead investigator on the case. Following Mr. Johnson's autopsy, Lieutenant Sewell collected two bullets that the medical examiner recovered from Mr. Johnson's chest. After the execution of the search warrant at the apartment on Orange Leaf Circle, all items of evidence were turned over to the crime scene unit. Lieutenant Sewell later took the evidence to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing to determine if any of the recovered weapons were used to kill Mr. Johnson.

Regarding the video surveillance footage obtained from Captain JJ's Fish and Chicken Restaurant, Lieutenant Sewell testified that it showed a black Infinity pull into the parking lot of Save-A-Stop. Two men got out of the back seat and went inside the market. Shortly after, two individuals arrived on a scooter, and both men got off the scooter and entered the market. Minutes later, the two men from the Infinity exited the market and got back into the car as the passenger from the scooter also exited the market. The Infinity then drove off, traveling west on Kimball Avenue. The video footage showed that, less than a minute later, the two men on the scooter left the market heading in the same direction as the Infinity.

Lieutenant Sewell testified that the video surveillance footage from the house near the crime scene showed that the Infinity stopped at the curb in front of the house and turned off its headlights. Someone got out of the car, and seven seconds later, the scooter's headlights approached. The video footage also showed that an individual walked away from the car on the sidewalk; then, the individual turned and ran back to the car. The Infinity started up again and continued driving west down Kimball Avenue.

Lieutenant Sewell explained that a second camera at the house captured video surveillance footage of the event from a different angle. The video footage showed that the scooter came down the road, changed course, and then crashed. It also showed muzzle flashes from a gun as the scooter approached. After the scooter crashed, the scooter passenger "g[o]t into the street" and fired his gun several times.[1]

Special Agent Kasia Lynch testified that she worked in the Firearms Identification Unit of the TBI's Memphis Regional Crime Laboratory. Agent Lynch received firearm evidence in connection with the case, including a .357 Sig Sauer pistol, five .357 Sig caliber cartridges, a Charter Arms .38 special revolver, and five .38 special cartridges. She also received two spent bullets taken from medical examiner's office. Agent Lynch tested these items and determined that the five .357 Sig caliber cartridge cases had been fired in the .357 Sig pistol. Additional testing revealed that the bullets from the medical examiner's office had not been fired from the Charter Arms .38 special revolver and that none of the spent cartridge casing Agent Lynch received had been fired in the revolver. Agent Lynch found that the bullets recovered from Mr. Johnson's body were consistent with .40 caliber bullets, and she determined that they were all fired from the same .40 caliber firearm. Agent Lynch testified that the bullets she received from the medical examiner "were not fired in [the] .357 Sig Sauer pistol."

Antonio Robinson testified that he was currently Defendant's cellmate at the Shelby County Jail and that he had known Defendant before their incarceration. Mr. Robinson identified his handwriting on an Advice of Rights form and testified that he recalled signing the form. He agreed that he identified Defendant and Mr. Johnson in photographs shown to him by police and that, on September 15, 2015, he gave a statement to police regarding the shooting. Mr. Robinson testified, "I don't recall giving them the full statement. I remember some of it though." He agreed that he initialed all five pages of his statement and signed it.

Mr. Robinson testified that he was with Defendant at the Save-A-Stop, located at the intersection of Kimball, Lamar, and Pendleton, on September 5, 2015. He said that he had been picked up on Pendleton by Defendant and two other people, whom he identified as "BK and Chris," in a "dark Infinity." They drove to the market, parked out front, and Mr. Robinson and Defendant went inside. Mr. Robinson was purchasing Defendant a drink and cigar when he saw Mr. Johnson. Defendant walked up to the counter where Mr. Robinson stood, and Mr. Johnson said, "[Y]'all n***s still on that bullsh*t?" Mr. Robinson told Mr. Johnson that he did not know Mr. Johnson, and Mr. Johnson responded, "[T]hat [Defendant] b*tch *ss knows he shot me." Mr. Robinson

---

[1] Both the video surveillance footage from the house and from Captain J.J.'s Fish and Chicken Restaurant were introduced as exhibits to Lieutenant Sewell's testimony.

responded that Mr. Johnson was being "petty," and Mr. Johnson said, "[F]*ck y'all." Mr. Robinson and Defendant then exited the market, got back into the Infinity, and proceeded up Kimball Avenue. BK, the driver of the Infinity, told Mr. Robinson that he was not going back towards where Mr. Robinson lived, so about halfway up the street, Mr. Robinson told him to pull over and let him out of the car and that he would walk back to his residence. Defendant then told BK, "[H]old on that's my little n****."

Mr. Robinson denied seeing any guns inside the car and said that he did not recall if the Infinity turned off its headlights when it pulled over. Mr. Robinson testified that he could not recall if Defendant and the others inside the Infinity got out at the same time he did. As he began to walk away, Mr. Robinson heard multiple gunshots coming from the direction of the scooter. He said that he was "in shock," and then the gunshots stopped. Mr. Robinson then ran back to the car. He denied telling police that he saw Defendant, BK, and Chris running back towards the car. Mr. Robinson testified that he saw BK and Chris shooting towards the scooter but that he did not recall seeing Defendant with a gun. Mr. Robinson said that he did not recall telling police that Defendant, Chris, and BK were responsible for Mr. Johnson's death.

Mr. Robinson denied telling police that, "as the car was pulling off[,] [Defendant] was passing Chris the gun[.]" Mr. Robinson said that he did not recall telling the police that BK turned off the headlights to the car as he was getting out. He said that, when he got out of the Infinity, BK and Chris were standing beside the car. He denied telling police that Defendant was out of the car and that he saw Defendant running back to the car after the gunshots stopped. He denied telling police that Defendant was armed with "a black, long machine gun." He denied telling police that he first saw Defendant's gun when BK first picked him up on Pendleton. He denied saying that Defendant got out of the Infinity with the gun and "started shooting" and that Defendant shot his gun towards the two men on the scooter. He agreed, however, that Chris and BK were shooting at the men on the scooter. He said that Chris and BK had handguns when they got out of the car. He agreed that he told police that he heard three distinct gunshots, when the shooting began. He said that the first shot he heard came from the scooter, but he acknowledged that this was not what he told police. He denied telling police that he saw Defendant, BK, and Chris get back into the car with their guns. Mr. Robinson testified that he saw the passenger on the scooter with a gun and that he believed both the passenger and Mr. Johnson were armed. He agreed, however, that he never saw Mr. Johnson with a gun.

On cross-examination, Mr. Robinson denied telling police that Defendant shot Mr. Johnson. He said that Mr. Johnson was "aggressive with his words" inside the market and that he approached Defendant like he wanted to fight. Mr. Robinson said that he used marijuana, heroin, and cocaine the day he provided his statement to police, even

though he told the police that he was not under the influence. He claimed that he did not say a lot of the things in his statement and that he did not read it before signing.

Lieutenant Sewell was recalled and testified that he took a statement from Mr. Robinson regarding the shooting on September 5, 2015. He said that he provided Mr. Robinson his *Miranda* rights and that Mr. Robinson agreed to waive his rights and talk to him. Lieutenant Sewell explained that Mr. Robinson's statement corresponded to the video surveillance footage collected by police from the surveillance cameras. He said that he typed up Mr. Robinson's statement while Mr. Robinson watched. Mr. Robinson was given the opportunity to review the statement prior to his initialing each page and signing it.

Lieutenant Sewell explained that Mr. Robinson told him that Defendant, BK, and Chris were responsible for Mr. Johnson's death. Mr. Robinson said that he saw Defendant, BK, and Chris shooting at the two men riding on the scooter. Mr. Robinson told police that Mr. Johnson confronted Defendant inside the market about Defendant's having previously shot Mr. Johnson. Mr. Robinson said that, as the Infinity pulled away from the market, he saw Defendant pass Chris a gun. When BK asked Defendant what was going on, Defendant instructed BK to "pull over." Mr. Robinson explained that, after BK pulled over, BK turned off the headlights, and they all got out of the car. Mr. Robinson said, "I was getting ready to walk off and heard a number of gunshots. I was in shock for like [thirty] seconds, and then I heard the gunshots stop. [Defendant] and them was running back to the car." Mr. Robinson said that he then heard gunshots coming from the area of the scooter. Mr. Robinson stated, "I heard three different guns at first, then I heard other gunshots from . . . down towards the scooter coming down our way." Mr. Robinson told Lieutenant Sewell that Defendant was armed with what looked like a "long black machine gun." He said that he first saw Defendant's gun when he got into the Infinity on Pendleton.

Lieutenant Sewell testified that Mr. Robinson did not appear to be under the influence and that Mr. Robinson denied being under the influence during the interview. He recalled that Mr. Robinson was cooperative and that Mr. Robinson made several corrections to the statement as Lieutenant Sewell typed. Lieutenant Sewell agreed that Mr. Robinson gave three different versions of the events of the night of September 5 but stated that the last version was the one supported by other evidence. He testified that Mr. Robinson initially said that he got out of the Infinity and never went back, but Lieutenant Sewell confronted Mr. Robinson with the video surveillance footage showing that Mr. Robinson returned to the car. Mr. Robinson then admitted getting back into the car but denied seeing anyone with a gun. Lieutenant Sewell explained that, as he was leaving the interview room after Mr. Robinson's second statement, Mr. Robinson stopped him and said that he had not told the truth. Mr. Robinson said that he did not want to "snitch" on

Defendant. He then told Lieutenant Sewell the final version of his statement, in which he said that he saw Defendant, BK, and Chris with guns and that they were all shooting at Mr. Johnson and the other man on the scooter.

### Deangelo Walker's testimony

During a jury-out hearing, Deangelo Walker testified that on October 21, 2012, he was with Mr. Johnson and Mr. Johnson's son at the corner at Wooddale and Barwood when some "guys" began shooting at them. Mr. Walker was hit by a bullet in his lower left leg. Mr. Johnson was also hit by a bullet in the leg. Mr. Walker identified Defendant as one of the individuals who shot at them. Mr. Walker stated that he did not know why Defendant shot at him and that he believed Mr. Johnson was Defendant's intended target. Mr. Walker said that Defendant was charged in juvenile court in relation to the shooting and that he and Mr. Johnson testified against Defendant in juvenile court regarding this prior shooting.[2]

At the close of the Rule 404(b) hearing, the State argued that Mr. Walker's testimony was not being offered as character evidence but to establish a motive for Defendant's shooting of Mr. Johnson on September 5, 2015. The State noted that his testimony explained a confrontation between Defendant and Mr. Johnson at the market just prior to the shooting, arguing that it provided context to the argument. Additionally, the State asserted that the evidence went to Defendant's identity, noting that the defense raised questions during cross-examination about the quality of the video footage collected by police and whether it was actually Defendant who shot at Mr. Johnson. In response, defense counsel argued that the evidence did not establish a motive for the instant shooting. Counsel argued that Defendant was fifteen years old at the time of the 2012 shooting and that it would be "unfair for this to come and be used against him in this situation."

In admitting Mr. Walker's testimony under Rule 404(b), the trial court stated:

> So, looking at 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person nor show action in conformity with that character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are one, the Court, upon request, . . . must hold a hearing outside the jury's presence.

---

[2] The record reflects that, following the hearing in juvenile court, Defendant was found to have committed aggravated assault against Mr. Johnson and Mr. Walker and was adjudicated delinquent.

Okay. So that's what we're doing now. And we'll make note again that the State did give notice of this, and that's not necessarily required under the rule, but nevertheless they did, ample notice to do that. And . . . the Court must determine that a material issue exists other than the conduct conforming with a character trait. It must upon request state on the record the material issue, ruling, the reasons for admitting the evidence. Okay. So I'll get back to that. The Court must find proof of the other crime, wrong, or act to be clear and convincing. I find that to be more than clear and convincing.

. . . .

[T]here is a bullet that was in [Mr. Johnson's] leg. Now I find out that that bullet was more than likely placed there by [D]efendant.

. . . .

I guess you're probably right [about the identity issue] as well. But it -- as far as the context of this conversation, who it was between now it's more clear, because of this prior incident where Mr. Johnson says . . . basically you're the one that shot me and they had words, which is, I guess understandable, I guess. But I still don't know the motive or why [Defendant] shot Mr. Johnson years before. I think it perhaps -- the motive on this particular evening would have been as like a preemptive strike, I guess or thinking that well, I guess since he saw me. He knows I'm around, maybe he's going to come looking for me.

The trial court determined that the prior shooting showed that Defendant had a settled purpose to harm Mr. Johnson. The court stated:

This also is highly relevant to that, that [D]efendant had a [settled] purpose to harm . . . Mr. Johnson. Now, if it were just that and . . . there weren't any other things like the context which I -- I find it's definitely relevant to put this in context and it'd explain the bullet and there's other things that I think it's admissible for as well as the [settled] purpose to harm and the identity. Because until this, I had no idea -- I was like, well, I don't know if he was out there shooting or not. But now . . . it's pretty clear that the jury would be justified in believing that either [Defendant] was shooting or he was having other people shoot under criminal responsibility.

So . . . I find there are ample reasons for admitting the evidence. The Court must exclude the evidence if its probative value is merely outweighed by the danger of unfair prejudice. . . . I think because of the [settled] purpose to harm, a motive to commit the homicide on this particular night, it's relevant to that, to explain the bullet being present in Mr. Johnson's leg and where it came from, to explain the argument, the context of this and the identity. I think . . . that the probative value far, far, far outweighs the danger of unfair prejudice.

Following the trial court's ruling, Mr. Walker testified before the jury consistently with his testimony at the hearing.

### Martieus Thomas's testimony

Martieus Thomas testified that he rode on the scooter with Mr. Johnson on September 5, 2015, and that went out to "get some weed" and cigars. When asked if Mr. Johnson got into an altercation with someone inside Save-A-Stop, Mr. Thomas stated, "I really don't just remember, because I was under the influence[.]" Mr. Thomas said that, as he and Mr. Johnson left the market on the scooter, they were shot at, and then they both fell off the scooter. Mr. Thomas hid behind a car, and Mr. Johnson ran through a yard and jumped over a gate. Mr. Thomas explained that he pulled out his Ruger 9mm and began "shooting back." When asked who was shooting at him, Mr. Thomas stated, "I couldn't see who it was, but I just seen like three or four people like all the way down the street shooting." Mr. Thomas said that he jumped over a gate and ran back to Mr. Johnson's residence, but Mr. Johnson was not there. He got rid of his gun and obtained another from Mr. Johnson's residence. Mr. Thomas testified that Mr. Johnson did not have a gun at the time of the shooting. When Mr. Thomas returned to the scene, he found that police and emergency services were there, so he returned to Mr. Johnson's residence. He testified that police came to the door about six or seven in the morning and informed those at the residence of Mr. Johnson's death. The police took Mr. Thomas into custody at that time.

Mr. Thomas identified an Advice of Rights form that he signed at 9:30 a.m. Mr. Thomas agreed that he spoke to police and told them what he remembered about the events of the previous night. He agreed that he viewed a photographic lineup and identified a man he knew as "Duke," as having been inside the market that night. He identified his signature on the photographic lineup and read what was written on the form. The form stated, "[T]his one of the dudes that shot at me and killed [Mr. Johnson]." He agreed that "Duke's" photograph was circled on the photographic lineup but claimed that he did not remember circling it. Mr. Thomas explained, "I was under the influence. I don't even remember nothing but getting shot at to be honest."

Mr. Thomas said that a written statement was prepared by an officer based on his answers to questions asked by the officer about what happened. Mr. Thomas identified a written statement as being the one presented to him by the officer, and he identified his initials and signature on the statement. He agreed that he had a chance to review the statement before he signed it. The following exchange then occurred:

> [THE STATE]: Do you remember giving this statement to the police?
>
> [MR. THOMAS]: Naw, I don't remember all that. Naw, I don't remember all that.
>
> . . . .
>
> [THE STATE]: Do you recall telling the officers that, "we came to the store, Save-A-Stop on Kimball and Lamar and we went inside." Do you remember telling the officers that?
>
> [MR. THOMAS]: Yeah.
>
> [THE STATE]: Okay. Do you remember telling them that [Mr. Johnson] saw the person that shot him like a year ago?
>
> [MR. THOMAS]: No. I don't remember telling them all of that.
>
> [THE STATE]: Okay. Do you remember telling them that they started passing words and one thing led to another?
>
> [MR. THOMAS]: Naw, I don't remember that.

Mr. Thomas stated that he did not recall giving those answers to police during questioning. Instead, he claimed that the police "switched [his answers] to they [sic] own stuff." When Mr. Thomas continued to testify that he did not remember telling the officer what was in the written statement, the State requested a jury out hearing.

During a jury-out hearing, the State sought to introduce into evidence the written statement as a prior inconsistent statement under Rule 803(26) of the Tennessee Rules of Evidence. In response, defense counsel argued that the hearsay exception did not apply, stating:

[W]e've already heard testimony that it's not reliable though. [Mr. Thomas] has said, first of all, that they asked him questions. He gave answers, and then they switched it. He's testified to that already. We heard him say that in open court in front of the jury.

The trial court responded, "Well, let me state for the record, to everyone that's in this courtroom it is totally obvious that [Mr. Thomas] is purposely being evasive and difficult. I want to get that on the record." The court continued:

[I]t's obvious to everyone here, not just me, . . . [Mr. Thomas] is deliberately being deceptive. And so I -- you know, as far as his not -- I don't really know if I believe that he doesn't remember. But that's neither here nor there. If he says he doesn't remember, then this -- this hearsay exception seems like it would apply.

Defense counsel argued that Mr. Thomas testified that he was under the influence at the time he gave the statement, but the trial court concluded that this would "go to the weight" of the evidence. The State noted that Mr. Thomas testified that he remembered some of the interview but not "the relevant parts" and argued that the parts of the interview Mr. Thomas claimed not to recall should "come in as substantive evidence."

The trial court responded that, based on Mr. Thomas's testimony, it did not appear that Mr. Thomas remembered "giving the statement at all." The trial court explained that the written statement was a typed statement by a police investigator that was witnessed by additional officers, after Mr. Thomas was read an Advice of Rights and Advice of Witness Viewing a Photographic Display form, both of which Mr. Thomas signed. The trial court ruled that Mr. Thomas's written statement was admissible, finding that the written statement was created under "reliable circumstances" and that it was "made under circumstances indicating trustworthiness."

When the jury returned to the courtroom, Mr. Thomas testified that he did not remember giving the statement to police. Mr. Thomas then identified Defendant as the man he knew as "Duke" and agreed that he circled Defendant's picture in the photographic lineup.

On cross-examination, Mr. Thomas testified that he was "on bars and weed and sh*t" at the time he was interviewed by police. He said that the handwriting on the photographic lineup was not his handwriting. He claimed that officers told him to circle someone he knew, so he circled Defendant's photograph. He said that he did not remember signing the document containing the photographic lineup but agreed that his signature was on it. Regarding his written statement, Mr. Thomas testified, "I think [the

- 11 -

officers were] writing a fictional account, because I don't remember seeing them typing nothing. I just remember them showing me some papers to sign, and I just wanted to get up out of there." He claimed that he did not read the statement before he signed it. He stated that he never saw the person who shot at him and Mr. Johnson.

On redirect, Mr. Thomas acknowledged that he had previously testified under oath about the shooting at a preliminary hearing in juvenile court in February 2016. He said that he did not recall identifying Defendant as the shooter at the preliminary hearing. Mr. Thomas testified that he listened to the audio recording of the preliminary hearing and agreed that he was on the recording. He stated, however, that he did "[n]ot really" remember giving that testimony in juvenile court.

The State then sought to play the recording of Mr. Thomas's preliminary hearing testimony, and defense counsel objected. The State argued that Defendant was wanting to argue that Mr. Thomas's statement was crafted by police but explained that it was "a statement that [Mr. Thomas has] given twice now, one under oath, almost verbatim." The following exchange occurred:

> [THE STATE]: The police didn't make him come into court and say that . . .
>
> THE COURT: What did he say in the juvenile court hearing?
>
> [THE STATE]: Exactly what's in that [written] statement.

Defense counsel objected to the introduction of the audio recording of Mr. Thomas's preliminary hearing testimony, but the trial court stated that defense counsel "clearly opened the door to all of it. I mean, suggesting to the jury that they just fabricated all of this . . . ." The trial court allowed the State to play the audio recording of Mr. Thomas's testimony at the preliminary hearing.

The State then recalled Lieutenant Sewell a second time. Lieutenant Sewell testified that he interviewed Mr. Thomas on September 5, 2015, and took a written statement from him. Lieutenant Sewell explained that Mr. Thomas had been identified as the passenger on the scooter with Mr. Johnson and that police had evidence that Mr. Thomas had shot back at the assailants. Lieutenant Sewell read Mr. Thomas his *Miranda* rights, and Mr. Thomas agreed to waive those rights and speak to him. Lieutenant Sewell sat at his desktop computer, with Mr. Thomas beside him, and typed Mr. Thomas's statement. He made the font large enough that Mr. Thomas could see it, and he requested that Mr. Thomas correct him if there were mistakes in the statement. After he finished typing the statement, Lieutenant Sewell printed it, and Mr. Thomas initialed each page

and signed the statement. Then, both Lieutenant Sewell and another officer signed the document as witnesses.

The State then introduced Mr. Thomas's statement, over Defendant's objection. In the statement, Mr. Thomas recalled the events leading up to the shooting:

> [W]e was [sic] at my house and we left to go get some cigars. We came to the store, Save-A-Stop on Kimball at Lamar. We went inside. [Mr. Johnson] saw the person that shot him like a year ago. They started passing words, and one thing led to another. We ended up pulling off on the scooter after they had left.

Mr. Thomas explained:

> Before we even got to the end of the street[,] shots were fired by the two dudes in the store and some others.

> Both of us fell off the scooter when the first shots was [sic] fired. We started [crawling] for cover trying to get cover behind a car in the driveway. When they started slowing down[,] I only heard about one shooter. I decided to get in the street and start shooting back. They started pulling off.

> They pulled off. I looked for [Mr. Johnson] . . . and didn't see him. So I thought he ran home. I ran to his house. When I got there[,] he wasn't there. I told his family what happened. I got the .30 and went back out to go look for [Mr. Johnson].

Mr. Thomas told Lieutenant Sewell that Mr. Johnson called one of the assailants "Duke," and Mr. Thomas provided a description of Duke. He said that Duke and a second assailant left the market first and got into their car. Mr. Thomas continued:

> [Mr. Johnson] said y'all shot me and this and that. They was [sic] getting into a black Infinity that had two in the front seat already. The guys in the front seat were talking to Duke, and the chubby guy as they were getting in. The dude in the driver's seat handed Duke a handgun. I seen [sic] that with my own eyes. When I seen [sic] that, I pulled my gun out because I thought they was fixing to start shooting, but they pulled off instead.

Mr. Thomas said that he and Mr. Johnson waited a minute and then drove off in the same direction as the Infinity. Mr. Thomas said that the Infinity stopped at the corner of Kimball and Labelle and turned off its headlights. He said that all four men got out of the car as he and Mr. Johnson rode towards them. Mr. Thomas stated, "I told [Mr. Johnson] to turn around and let me off the [scooter]. He didn't get a chance. They started shooting[,] and we crashed." Mr. Thomas said that he thought all four men were shooting at them. He saw two of the guns; he said, "One of them was a .30, because I seen [sic] that long magazine. I think one had a shotgun because it sounded like it." He said that he heard the gunfire and saw bullets hitting the ground and going by his head. Mr. Thomas explained that he had a black Ruger 9mm, which he threw into a nearby yard after shooting back at the four men. He said that Mr. Johnson did not have a weapon. He said that he had met Defendant one time "at juvenile." Mr. Thomas denied that he was under the influence of alcohol or drugs at the time of his statement.

Lieutenant Sewell said that Mr. Thomas did not appear to be under the influence. Lieutenant Sewell allowed Mr. Thomas time to review the statement before he signed it. Lieutenant Sewell stated that he interviewed Mr. Thomas eight to nine hours after the shooting. Lieutenant Sewell agreed that a portion of the video surveillance footage showed that several people got out of the Infinity. Lieutenant Sewell identified an Advice of Witness Viewing Photographic Display form that he provided to Mr. Thomas. He said that Mr. Thomas indicated that he understood the form and then signed and dated it. Mr. Thomas picked Defendant out of the photographic lineup and identified Defendant as one of the men shooting at him and Mr. Johnson.

Following deliberations, the jury convicted Defendant of second degree murder, attempted second degree murder, and employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court sentenced Defendant, as a Range I standard offender, to consecutive sentences of twenty-five years for second degree murder, twelve years for attempted second degree murder, and six years for employing a firearm in the commission of a dangerous felony, for a total effective sentence of forty-three years to serve in the Tennessee Department of Correction.

Defendant filed a timely motion for new trial, which the trial court denied in a written order after a hearing. This timely appeal follows.

## II. Analysis

### A. Mr. Thomas's prior written statement to police

Defendant contends that the trial court erred in allowing the State to introduce the entire written statement of Mr. Thomas under Rule 803(26) of the Tennessee Rules of

Evidence. He argues that Mr. Thomas acknowledged that he gave a statement to police, that he signed and initialed the statement, and that he remembered telling police certain parts of the statement. Defendant asserts that, during the jury-out hearing, the trial court should have allowed the State to review each question and answer in Mr. Thomas's written statement to determine which portions of the statement were consistent with his trial testimony and that the trial court should have excluded or redacted the consistent portions of Mr. Thomas's statement. The State responds that the trial court properly exercised its discretion in admitting the entire written statement of Mr. Thomas as substantive evidence.

A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. One such exception pertains to prior inconsistent statements of a testifying witness. Tennessee Rule of Evidence 803(26) provides that a witness's prior statement is admissible as substantive evidence if it is otherwise admissible under Rule 613(b) and if all the following conditions are satisfied:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
>
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement under oath.
>
> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). Tennessee Rule of Evidence 613(b) provides in pertinent part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

- 15 -

Our supreme court has determined that "a prior statement about events that a witness claims at trial to be unable to remember is 'inconsistent' with the witness' trial testimony," regardless of whether the memory loss is genuine, feigned, or exaggerated. *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015). The supreme court noted in *Davis* that its holding was:

> in accord with decisions construing the meaning of "inconsistent" in Tennessee Rule of Evidence 613(b), which, under certain circumstances, allows a party to impeach a witness with extrinsic evidence of prior inconsistent statements. *See, e.g., State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (indicating that a prior statement is inconsistent for the purposes of Rule 613(b) when the witness at trial denies or equivocates about having made the statement); *see also State v. Kendricks*, 947 S.W.2d 875, 882 (Tenn. Crim. App. 1996) (stating that, if a witness does not recall making a statement, the prior statement can be used to impeach the witness); [Neil P. Cohen, et al., Tennessee Law of Evidence] § 6.13[3] [6th ed. 2011] (noting that "evasive answers at trial may make an earlier statement inconsistent with the trial testimony").

*Id*.

This court has previously stated that, "when a witness's prior statement contains both consistent and inconsistent portions, the consistent portions are not admissible pursuant to Tennessee Rule of Evidence 803(26)." *State v. Kerry Granderson*, No. W2016-01687-CCA-R3-CD, 2017 WL 2875499, at *5 (Tenn. Crim. App. July 5, 2017), *perm. app. denied* (Tenn. Nov. 20, 2017). In such cases, the prior statement should be redacted. *See id.* (citing *State v. Nathan Bernard Lalone*, No. E2016-00439-CCA-R3-CD, 2017 WL 2297653, at *19 (Tenn. Crim. App. May 25, 2017), *no perm. app. filed*; *State v. Robert Allen Zaloba*, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *20-21 (Tenn. Crim. App. Dec. 26, 2012), *perm. app. denied* (Tenn. Apr. 10, 2013); *State v. Charles Jackson and Willis Holloway*, No. W2010-01133-CCA-R3-CD, 2012 WL 543047, at *10 (Tenn. Crim. App. Feb. 17, 2012), *perm. app. denied* (Tenn. June 22, 2012)).

In this case, the trial court did not abuse its discretion by admitting into evidence Mr. Thomas's prior written statement in its entirety. Mr. Thomas testified at trial and was subject to cross-examination concerning the statement. The statement at issue was a written statement signed by Mr. Thomas during his interview with police, the morning after the shooting, after having been advised of his rights under *Miranda*. The trial court conducted a jury-out hearing and determined that the prior written statement was made under circumstances indicating trustworthiness. *See* Tenn. R. Evid. 803(26). Moreover,

Mr. Thomas was afforded the opportunity to explain or deny his prior written statement, during which he claimed that most of his statement was created by the officers conducting the interview. Thus, the requirements of Rule 613(b) were satisfied.

Mr. Thomas's prior written statement concerned events that he claimed he was unable to remember at trial. When asked if Mr. Johnson got into an altercation with someone inside Save-A-Stop, Mr. Thomas stated, "I really don't just remember, because I was under the influence[.]" He agreed that he viewed a photographic lineup and identified someone he knew as "Duke" as having been inside the market that night, but he claimed that he did not remember circling Duke's photograph. Mr. Thomas then stated, "I was under the influence. I don't even remember nothing but getting shot at to be honest." When asked if he remembered giving a statement to police, Mr. Thomas responded, "Naw, I don't remember all that. Naw, I don't remember all that." The following exchange then occurred:

> [THE STATE]: Do you recall telling the officers that, "we came to the store, Save-A-Stop on Kimball and Lamar and we went inside." Do you remember telling the officers that?
>
> [MR. THOMAS]: Yeah.
>
> [THE STATE]: Okay. Do you remember telling them that [Mr. Johnson] saw the person that shot him like a year ago?
>
> [MR. THOMAS]: No. I don't remember telling them all of that.
>
> [THE STATE]: Okay. Do you remember telling them that they started passing words and one thing led to another?
>
> [MR. THOMAS]: Naw, I don't remember that.

Mr. Thomas testified that he did not recall giving those answers to police questioning and claimed that the officers conducting the interview "switched [his answers] to they [sic] own stuff." Following the jury-out hearing, when Mr. Thomas returned to the stand, he testified that he did not remember giving the prior written statement to police. On cross-examination, Mr. Thomas said that he was "on bars and weed and sh*t" at the time he was interviewed by police. Thus, the trial court's determination that Mr. Thomas did not remember "giving the statement at all" was certainly a fair characterization of Mr. Thomas's testimony.

Defendant attempts to distinguish this case from *Davis* by arguing that Mr. Thomas "clearly" testified that he remembered giving parts of his written statement. However, Defendant has failed to identify substantive portions of Mr. Thomas's prior statement that were consistent with his trial testimony. Contrary to Defendant's assertions, Mr. Thomas's trial testimony was not clear; as found by the trial court, he was purposely "evasive and difficult" and "deliberately [] deceptive" in his testimony. The trial court properly recognized, however, that whether Mr. Thomas's memory loss was genuine was irrelevant; his testimony that he did not recall the contents of his statement to police the morning after the shooting—presumably due to his being under the influence and "on bars and weed and sh\*t"—was inconsistent with his written statement. *See Davis*, 466 S.W.3d at 64. The written statement was admissible as a prior inconsistent statement under Rule 803(26).

Moreover, we conclude that any possible error in the admission of Mr. Thomas's written statement under Rule 803(26) would be harmless. *See* Tenn. R. App. P. 36(b). The State also introduced Mr. Thomas's preliminary hearing testimony, during which Mr. Thomas testified consistently with his written statement to police, and Defendant does not challenge the introduction of the preliminary hearing testimony on appeal. Thus, even if the trial court had not admitted Mr. Thomas's written statement in its entirety, the substance of the entire written statement was before the jury in the form of Mr. Thomas's preliminary hearing testimony. Moreover, as noted by the State, Mr. Thomas's prior written statement would also be properly admitted as a recorded recollection under Tennessee Rule of Evidence 803(5), which states that "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly." Tenn. R. Evid. 803(5).[3]

The trial court followed the mandates of Tennessee Rule of Evidence 803(26), and the record supports the trial court's determinations. Therefore, we conclude that the trial court did not abuse its discretion by admitting Mr. Thomas's entire prior written statement as substantive evidence. Defendant is not entitled to relief on this claim.

### B. Mr. Walker's testimony regarding the prior shooting

Defendant asserts that the trial court abused its discretion by allowing the State to introduce, pursuant to Rule 404(b) of the Tennessee Rules of Evidence, the testimony of

---

[3] We note that, if admitted under Rule 803(5), Mr. Thomas's written statement could be read into evidence, but the statement itself could not be received as an exhibit "unless offered by an adverse party." Tenn. R. Evid. 803(5).

Mr. Walker about Defendant's prior shooting of Mr. Johnson. He argues that the trial court "allowed the jury to hear testimony from a witness to an almost identical crime, wherein Defendant played an identical role, and where Defendant targeted the same victim[.]" Defendant contends that no material issue existed other than conduct conforming to a character trait and that the probative value was outweighed by the danger of unfair prejudice. The State responds that the trial court properly exercised its discretion in admitting Mr. Walker's testimony under Rule 404(b) because it was offered for purposes other than showing Defendant's propensity for violence, and the probative value of Mr. Walker's testimony outweighed the danger of unfair prejudice.

Generally, this court reviews a trial court's decision to admit evidence based upon its relevancy under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Likewise, when such evidence is offered under Tennessee Rule of Evidence 404(b) and the trial court has "substantially complied" with the procedural requirements in that rule, we review the trial court's decision under an abuse of discretion standard. *Id.* We will reverse the trial court's decision "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the defendant's motive, identity, or intent; the absence of mistake or accident; opportunity; or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

Before admitting Mr. Walker's testimony, the trial court held a jury-out hearing and found that a material issue other than conduct conforming with a character trait existed. *See* Tenn. R. Evid. 404(b). Specifically, the trial court concluded that Mr. Walker's testimony was admissible because it related to Defendant's motive to commit the homicide on the night of the offense, showed Defendant's settled purpose to harm Mr. Johnson, provided contextual background to the confrontation between Mr. Johnson and Defendant inside the market prior to the shooting, and explained the presence of the bullet in Mr. Johnson's leg. The trial court found that the proof of the prior bad act was clear and convincing and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. *See id.* Because the trial court substantially complied with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652; *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Davis*, 466 S.W.3d at 61.

Our supreme court has determined that evidence of a defendant's prior acts of violence against the victim in a murder case is admissible under Tennessee Rule of Evidence 404(b) because the acts are relevant to showing the defendant's hostility toward the victim, the settled purpose to harm the victim, and the intent and motive for the killing. *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *see also State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008); *State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982). Additionally, "contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be offered as an 'other purpose' under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case." *Gilliland*, 22 S.W.3d at 272.

We conclude that evidence of Defendant's prior shooting of Mr. Johnson was properly admitted. The evidence was relevant because it established the relationship

between the parties and showed Defendant's hostility toward the victim, malice, intent,[4] and a settled purpose to harm the victim. *See id.* Not only did the State offer proof of Defendant's prior violent act against Mr. Johnson but also that Mr. Johnson subsequently testified against Defendant in juvenile court, leading to Defendant's delinquency adjudication. The evidence of Defendant's prior violence towards Mr. Johnson was admitted not to prove that Defendant acted in accord with this character trait but as part of the proof establishing Defendant's motive for killing Mr. Johnson.

Furthermore, the probative value of the testimony was not outweighed by the danger of unfair prejudice. When there is a "lack of forensic evidence" linking a defendant to a crime, "the probative value of evidence tending to prove *why* the defendant committed the crime [is] high." *State v. Jones*, 15 S.W.3d 880, 895 (Tenn. Crim. App. 1999) (emphasis added). Here, the State relied heavily on the written statements of Mr. Thomas and Mr. Robinson, who identified Defendant as directing and participating in the shooting. The State also relied on Mr. Walker's testimony about the prior shooting to establish Defendant's motive and intent, his settled purpose to harm Mr. Johnson, and to provide context for the confrontation with Mr. Johnson inside the market immediately before the shooting. Because Mr. Walker's testimony about the prior shooting was highly probative of these material issues, we conclude that the similarity of the prior shooting to the charged offense, although prejudicial, was not *unfairly* prejudicial. *State v. Mallard*, 40 S.W.3d 473, 488 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 655; *State v. Nesbit*, 978 S.W.2d 872, 893 (Tenn. 1998); *State v. Hall*, 958 S.W.2d 679, 708 (Tenn. 1997)) ("[W]hen evidence of prior acts is highly probative of a material issue at trial, the chance of *unfair* prejudice to the defendant is correspondingly diminished.") (emphasis in original).

Relying on *State v. Jones*, 450 S.W.3d 866, 894 (Tenn. 2014), Defendant argues that the danger of unfair prejudice posed by Mr. Walker's testimony outweighed its probative value because Defendant's prior shooting of Mr. Johnson was substantially similar to the charged offense but was not so distinctively similar as to establish Defendant's identity. *See id.* at 894-99. In *Jones*, our supreme court held that, when the material issue at trial is the identity of the defendant,

> [t]he probative value of evidence of other crimes . . . depends upon the extent to which it raises an inference that the perpetrator of the prior

---

[4] We note that Defendant was only indicted for second degree murder, which is a knowing killing. *See* Tenn. Code Ann. § 39-13-210(a)(1) (2015). However, a finding that a defendant acted intentionally necessarily establishes that the defendant acted knowingly. *See* Tenn. Code Ann. § 39-11-301(a)(2) (2015). Therefore, the State could use the prior bad act evidence to prove that Defendant acted intentionally on the night of Mr. Johnson's murder. *See e.g., State v. Jimmie Martin*, No. W2013-00889-CCA-R3-CD, 2014 WL 2566490, at *16 (Tenn. Crim. App. June 5, 2014).

offenses was the perpetrator of the offense in issue. Both the existence and the strength of an inference proceeds through an evaluation of the similarities between the prior offense and the charged crime. Thus, *if the characteristics of both the prior offense and the charged offense are not in any way distinctive*, but are similar to numerous other crimes committed by persons other than the defendant, no *inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offense and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense[ ] also committed the offense on trial*[.]

*Id.* at 895 (quoting *Bunch v. State*, 605 S.W.2d 227, 230 (Tenn. 1980)) (emphasis in original). We agree with Defendant that the prior shooting and the instant offense were not so distinctively similar as to establish Defendant's identity, and thus, Mr. Walker's testimony about the prior shooting should not have been admitted for this purpose under Rule 404(b). However, as previously explained, the trial court properly admitted evidence of the prior shooting to show Defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim. Defendant is not entitled to relief.

## C. Sufficiency of the evidence

Defendant contends that the evidence adduced at trial was insufficient to sustain his convictions. He argues that the two eyewitnesses testified that they did not see Defendant with a weapon or fire a weapon, that it was not possible to identify the shooter on the surveillance videos introduced at trial, and that the guns found in Defendant's apartment were found not to be the weapon that killed Mr. Johnson. The State responds that the evidence is sufficient for any rational trier of fact to find Defendant guilty of second degree murder, attempted second degree murder, and employing a firearm during the commission of a dangerous felony beyond a reasonable doubt.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2015). Second degree murder is a "result of conduct" offense. *See State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2015); *see Brown*, 311 S.W.3d at 431. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2015).

"It is an offense to employ a firearm during the . . . [c]omission of a dangerous felony[.]" Tenn. Code. Ann. § 39-17-1324(b)(1) (2015). Attempt to commit second degree murder is a "dangerous felony." Tenn. Code Ann. § 39-17-1324(i)(1)(B) (2015). The term "employ" means "to make use of." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014).

Although jury instructions were not included in the appellate record, the trial court indicated in a discussion on the jury instructions that it intended to charge the jury on criminal responsibility, and the State referenced a jury instruction on criminal responsibility during its closing argument. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2015). As pertinent here, "[a] person is criminally responsible for an offense committed by the conduct of another, if[,] . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2015).

Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's convictions under a theory of direct criminal liability or a theory of criminal responsibility. Mr. Thomas testified that he rode with Mr. Johnson to the Save-A-Stop market on September 5, 2015. He said that, while inside the market, Mr. Johnson saw Defendant. Mr. Thomas testified that Defendant had shot Mr. Johnson previously and that Mr. Johnson and Defendant began "passing words, and one thing led to another." Mr. Thomas testified that he and Mr. Johnson left the market on a scooter after Defendant and his friends pulled away. Mr. Thomas stated that, before he and Mr. Johnson got to the end of Kimball Avenue, they were shot at and that both he and Mr. Johnson fell off the scooter.

Mr. Thomas told Lieutenant Sewell that he saw the man in the driver's seat of the Infinity hand Defendant a gun before the Infinity pulled away from the market. Mr. Thomas said that the Infinity stopped at the corner of Kimball and Labelle and turned off its headlights. He said that all four men got out of the car as he and Mr. Johnson were riding towards them. Mr. Thomas stated, "I told [Mr. Johnson] to turn around and let me off the [scooter]. He didn't get a chance. They started shooting[,] and we crashed." Mr. Thomas said that he thought all four men were shooting at them. Lieutenant Sewell testified that Mr. Thomas picked Defendant out of a photographic lineup and identified Defendant as one of the men who shot at him and Mr. Johnson.

Mr. Robinson testified that he was with Defendant inside the market when Mr. Johnson confronted Defendant and became verbally aggressive about the prior shooting. Mr. Robinson said that he and Defendant got back into the Infinity with two of their friends, Chris and BK, and proceeded up Kimball Avenue. Mr. Robinson told Lieutenant Sewell that, as the Infinity pulled away from the market, he saw Defendant pass Chris a gun. About halfway up the street, Defendant directed BK to "pull over," telling him, "[H]old on. That's my little n****." Mr. Robinson explained that BK pulled over and turned off the headlights and that they all got out of the car. Mr. Robinson told

Lieutenant Sewell that Defendant was armed with what looked like a "long black machine gun." Mr. Robinson said that, as he began to walk away from the Infinity, he "heard three different guns at first" and then "heard other gunshots from . . . down towards the scooter coming down our way." Mr. Robinson said that Defendant, BK, and Chris had guns and were all shooting at Mr. Johnson and Mr. Thomas as they rode towards them on the scooter. Lieutenant Sewell testified that video surveillance footage from multiple vantage points confirmed the sequence of events as described by Mr. Robinson in his written statement.

Officer Douglas testified that, by the time that paramedics arrived at the scene, Mr. Johnson was deceased. Dr. Benson testified that the cause of Mr. Johnson's death was two gunshot wounds to the chest and that manner of death was homicide. Although the gun used to kill Mr. Johnson was not located, officers recovered nine .40 caliber shell casings on Kimball Avenue where the Infinity had pulled over. At the same location, they also recovered sixteen .223 caliber casings, five .357 caliber casings, and one casing of an unknown caliber. When police executed a search warrant at Defendant's apartment weeks later, they found a fully loaded .357 Sig Sauer pistol, and testing by the TBI confirmed that the pistol was used to fire the five .357 caliber casings found on Kimball Avenue.

We conclude that the foregoing evidence is more than sufficient to support a finding that Defendant is guilty of second degree murder of Mr. Johnson, attempted second degree murder of Mr. Thomas, and employing a firearm during the commission of a dangerous felony beyond a reasonable doubt. This issue is without merit.

### III. Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 25 -